5

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

AUG 0 7 2000

Michael N. Milby
Clerk of Court

| | |
|---|---|
| HORACIO GARCIA-CASTRO, | § |
| Petitioner-Defendant | § |
| | § |
| vs. | § |
| | § |
| UNITED STATES OF AMERICA, | § |
| Respondent-Plaintiff | § |
| (CA B-00-097) | § |

C A B - 00-97

~~CR B-97-490-S1-01~~

## GOVERNMENT'S ANSWER, MOTION FOR DISMISSAL UNDER 8(a) OF THE RULES FOLL. 28 U.S.C. § 2255, OR IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT

1.

On June 23, 2000, Garcia filed the instant motion to vacate sentence pursuant to 28 U.S.C. § 2255. This Court forwarded a copy of the pleading to the government on July 5, 2000 (Tab 1). This Court did not direct the government to answer the pleading. In fact, the Court advised that "[t]he United States Attorney is not required, however, to answer or otherwise move with respect to the motion unless ordered by the Court."

On July 25, 2000, the Court directed the government to respond to the pleading by August 7, 2000. This order was FAXed to this office on the same date.

1.

The matter was docketed in the Appellate Section and assigned to the undersigned July 28, 2000, and was received by the undersigned yesterday, July 31, 2000.

Initially, the government will address that part of the July 25, 2000 order intimating the government violated Fed. R. Civ. P. 12(a)(1)(A) by failing to file an answer timely. This averment if based upon some dubious factual and legal premises and merits cursory examination.

### 2.

The previous order by this Court, as found at TAB 1, was in conformance with Rule 4 of the rules foll. 28 U.S.C. § 2255 which directs that if, following review by the lower court, dismissal is not plainly apparent, "the judge shall order the respondent to file an answer or other pleading with the period of time fixed by the court...." The government was not required to answer the § 2255 pleading until instructed to do so. The government was instructed to await further instructions, not answer the pleading.

Moreover, the order found at TAB 1 was consistent with Rule 3(b) of the Rules Governing § 2255 proceedings ("The filing of the motion shall not require said United States Attorney to answer the motion or otherwise move with respect to it unless ordered by the court."); *see also* Liebman and Hertz, 2 *Federal Habeas Corpus Practice and Procedure* 41.5b, p. 1208 n.3 (Michie Company 1994).

2.

CWcPDF - www.fasisa.com

Nevertheless, this Court issued the July 25 order, the likes of which has not been seen by the undersigned over the course of more than 10 years of federal practice involving prisoner litigation, that suggests the government was derelict in failing to respond *sua sponte* to a prisoner petition under § 2255 "in violation of Federal Rule of Civil Procedure 12(a)(1)(A)."

The government has been in full compliance with this Court's previous order and with the rules governing post-conviction prisoner litigation. The government objects to the finding that Rule 12(a)(1)(A) was violated by the government. The government complied with the previous order, *see* TAB 1, and received no additional order directing that a response was required within 20 days of receipt of the pleading.

Rule 12(a)(1)(A) of the Rules of Civil Procedure simply is inapplicable to the quasi-criminal pleadings that fall under 28 U.S.C. § 2255 in light of the specific rules governing responses to § 2255 litigation. As the Advisory Committee Notes to Rule 4, foll. 28 U.S.C. § 2255 relate, "[r]ule 4 has as its basis in §2255 (rather than 28 U.S.C. § 2243 in the corresponding habeas corpus rule) which does not have a specific time limitation as to when the answer must be made." *See also* Rule 12 of the Rules Governing §2255 litigation (noting that rules of criminal and civil procedure may apply ..."[i]f no procedure is specifically prescribed by these

3

rules...." Furthermore, the July 25, 2000 order is inconsistent with the previous order received. *See* TAB 1. The government has not violated Rule 12(a)(1)(A). Rule 12(a)(1)(A) does not apply to responses under 28 U.S.C. § 2255 litigation unless this Court advised otherwise. This Court did not direct the government to comply with such rule. No violation of the applicable rules occurred.

The Court has directed the government to respond in expedited fashion to Garcia's § 2255 motion by August 7, 2000. Even by the terms of Fed. R. Civ. P. 12(a)(3), the government is entitled to a full 60 days to answer a complaint; here the government is given far less time. In light of this Court's July 25, 2000 order however, the government submits the following motion to dismiss and, in the alternative, motion for summary judgment.

### 3.

Garcia, Arturo Pena and Guadalupe Ortiz-Aurelio were indicted in the Brownsville Division of the Southern District of Texas on December 22, 1997, in CR B-97-490, and charged with conspiracy to possess with intent to distribute more than 500 grams of cocaine, in violation of 21 U.S.C. §§ 841 and 846 (count one) and aiding and abetting the possession with intent to distribute more than 500 grams of cocaine in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(counts two and three). In count three, Javier Munoz was identified as

4

a co-defendant. On January 9, 1998, Garcia entered a plea of not guilty in the presence of retained attorney, Angel Castro (Doc. 19, 22). He appeared again on January 11, 1999 accompanied by retained attorney Joe Valle (Doc. 26). The substitution of attorney Valle for attorney Castro was granted on January 16, 1999 (Docs. 6, 17).

On February 4, 1998, a superseding indictment was filed (Doc. 35). In addition to the three charges alleged in the original indictment, Garcia was charged with possession of 2.8 grams of cocaine in violation of 21 U.S.C. § 841 (count five), unlawful possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1) (counts six and seven) and the unlawful importation into the United States of two horned lizards in violation of 16 U.S.C. § 3372(a)(1)(A) and § 3373(d)(1)(A). Garcia's codefendants entered guilty pleas (Docs. 57-58 (Ortiz); 62 (Munoz); 64-65 (Pena)). Garcia was tried to a jury following jury selection on March 6, 1998 (Docs. 67, 71-73).

During the trial, the district court granted a motion for judgment of acquittal on count eight but denied judgments of acquittal on counts one through seven (Doc. 72). Garcia was subsequently found guilty of the remaining counts of the superseding indictment (Docs.73, 75).

5

The probation department scored Garcia under counts one through three and five at base offense level 26 as a result of the net weight of cocaine seized in the case: 512 grams of cocaine (503.48 net weight) from Ortiz' vehicle; 522 grams of cocaine (499.34 net weight) from Pena; 327 grams of cocaine (323.89 net weight) from the apartment where Munoz was found; and 2.8 grams of cocaine (2 grams net weight) of cocaine seized from Garcia (PSR, ¶¶25, 27-28, 30-31, 39). It was recommended that Garcia receive a two-level upward adjustment for his leadership role in offense for an adjusted offense level of 28 (PSR, ¶¶39-44). The score for the remaining counts of conviction resulted in a total offense level 14 (PSR, ¶¶45-56). The department recommended against Garcia receiving any reduction for acceptance of responsibility for several reasons, including his post-trial insistence that a worker was responsible for the drugs found in Garcia's truck, not him (PSR, ¶¶35-36, 57). Garcia's previous criminal history, which included a prior conviction for first degree felony possession of cocaine, resulted in a criminal history score of three points and a level II (PSR, ¶¶60-63). The punishment range for a total offense level 28, criminal history category II, was determined to be 87 to 108 months; however, under counts one through three, a minimum mandatory 120 months was required to be imposed (PSR, ¶¶91-111).

6

At sentencing held on June 11, 1998, Garcia was ordered to serve concurrent 120-month terms of imprisonment on counts one, two, and three; and concurrent 87-month terms of imprisonment on counts five, six, and seven. All of the terms of imprisonment were to be served concurrent with one another. The terms of imprisonment were to be followed by concurrent 8-year terms of supervised release. Garcia was ordered to pay the mandatory assessment of $600 (Docs.104, 106). His direct appeal, pursued by appointed attorney Rene Gonzalez and challenging the sufficiency of the evidence to support his convictions, was unsuccessful. *United States v. Garcia-Castro*, 98-40827 (5th Cir. July 29, 1999) (Docs. 107, 125, 126). No further review was sought. Garcia filed the instant § 2255 motion on June 23, 2000. On July 25, 2000, this court directed the government to respond to Garcia's § 2255 pleading.

## 4.

## ALLEGATIONS

Garcia faults his trial attorney's representation in several grounds of error. He argues attorney Valle failed to investigate a plausible theory of defense and failed to prepare for trial. He faults Valle's review of the sentencing guidelines, failure to challenge the amounts and purity of drugs seized and held attributable

against him, failure to object to the reliance upon the PSR, and advice concerning whether to enter a guilty plea.

### 5.

The pleading is timely. The instant pleading was filed on June 23, 2000, less than one year from the date that the judgment was final. *Frank v. United States*, 526 U.S. 1009, 119 S.Ct. 1152 (1999).

### 6.

The government denies each and every allegation of fact made by Garcia except those supported by the record and those specifically admitted herein, and demands strict proof thereof.

### 7.

To obtain post-conviction relief in a collateral attack, a defendant must show either (1) cause excusing his procedural default and actual prejudice resulting from the alleged error, *see United States v. Frady*, 456 U.S. 152, 167-68, 102 S.Ct. 1584, 1594 (1982), or (2) that he is actually innocent. *United States v. Shaid*, 937 F.2d 228, 232 (5th Cir. 1991) (en banc).

The cause-and-prejudice standard is met by allegation and proof of ineffective assistance of counsel. *United States v. Gaudet*, 81 F.3d 585, 589 (5th Cir. 1996). "'Actual innocence' means 'factual innocence, and not mere legal insufficiency.'"

8

*Bousley v. United States*, 523 U.S. 614, 623-24, 118 S.Ct. 1604, 1611-12 (1998);

*United States v. Torres*, 163 F.3d 909, 911 n.9 (5th Cir. 1999).   To prove actual

innocence, the petitioner "must demonstrate that, in light of all the evidence, it is

more likely than not that no fact finder] would have convicted him." *Id.* (citations

and quotations omitted).

> To establish ineffective assistance of counsel, a movant

>> must demonstrate that his attorney's performance was
>> deficient. *See Strickland [v. Washington*, 466 U.S. 668,]
>> 688, 104 S.Ct. 2052, [2064-65 (1984)]. In order to be
>> deficient, counsel's performance must be "outside the
>> wide range of professionally competent assistance." *Id.* at
>> 690, 104 S.Ct. [at 2066]. If he succeeds in satisfying the
>> first hurdle, then a petitioner must also demonstrate that
>> the deficient performance prejudiced the defense such that
>> "there is a reasonable probability that, but for counsel's
>> unprofessional errors, the result of the proceeding would
>> have been different." *Id.* at 694, 104 S.Ct. [at 2068]; *see
>> also Bryant v. Scott*, 28 F.3d 1411 (5th Cir. 1994).

*United States v. Drones*, 2000 WL 942920 at *4 (5th Cir. July 25, 2000). In the

context of sentencing, prejudice is demonstrated where, "but for counsel's error",

the sentence would have been "significantly less harsh". *United States v. Stewart*,

207 F.3d 750, 751 (5th Cir. 2000).

8.

## Failure to investigate plausible theory of defense

In his first ground for review, Garcia claims that counsel failed to investigate a plausible theory of defense. The theory is neither identified or discussed or shown to have been plausible. It is a conclusory claim. The claimed-attorney error is too vague, speculative and conclusory to  warrant further review. *See United States v. Pineda*, 988 F.2d 22, 23 (5th Cir. 1993) (vague, conclusory claim subject to dismissal); *United States v. Acklen*, 47 F.3d 739, 743-44 (5th Cir. 1995) ("Mere conclusory" statements are insufficient to require limited discovery or an evidentiary hearing.). Moreover, the allegations are inadequate to support a claim of ineffectiveness. *United States v. Bartholomew*, 974 F.2d 39, 41 (5th Cir. 1992).

To the extent the claim relates to an "entrapment" defense, Garcia does not develop the contention.  Moreover, he fails to account for the defensive strategy employed at trial when he relied upon Pena to claim all of the drugs belonged to him (Pena) anyway.   Garcia, in order to establish an entrapment defense, would necessarily have to admit his complicity in the offense. Even after the trial, Garcia was denying any complicity in the offense. This argument is conclusory and refuted by Garcia's own defensive posture prior to, during and after trial.

10

9.

## Failure to investigate Sentencing Guidelines

In his second ground of error, Garcia likewise charges in conclusory fashion his trial attorney with deficient representation by failing to investigate the sentencing guidelines (*See* §2255 motion, pp. 2, 21-26). He does not identify what was deficient about the representation or how counsel erred. He also does not demonstrate how he was prejudiced by counsel's representation, or what counsel failed to investigate. This argument is too vague and conclusory to respond to or justify § 2255 relief.

10.

## Failure to challenge quantity of drugs seized

In ground of error three, Garcia argues that counsel erred by failing to challenge the amount of drugs attributable to him. The amount of drugs attributable to him is supported by the trial testimony.

## Summary of Facts

When Deputy Sheriff Ortiz was arrested on October 1, 1997 in possession of 522 grams gross weight of cocaine, concealed in a diaper bag from his vehicle, it was demonstrated that Ortiz received the cocaine from Garcia (2 R. 25-26. 40, 79-

11

80; 3 R. 261, 265, 347, 352). Ortiz cooperated with the government, including testifying against Garcia (2 R. 27; 3 R. 266).

Ortiz contacted Garcia telephonically (2 R. 29, 31-32, 45-46, 78-79, 105-06, 127; 3 R. 268-71, 292, 352-353, 404, 419). Pena later surfaced to effect the transaction on Garcia's behalf (2 R. 33-34, 48, 57, 128, 131; 3 R. 271; 407, 408).

A surveillance unit followed Pena to an apartment complex. Here, Agent John Schexnayder recalled, the surveillance agents briefly lost sight of Pena's vehicle. After perhaps ten to fifteen minutes of patient searching, Pena's vehicle was located under a carport marked for apartment 156 (2 R. 133, 204). However, when the vehicle left the apartment complex, the surveillance team lost it again (2 R. 134). It was about this time the Agent Schexnayder received word that Ortiz was going to meet Pena at the corner of South Dakota and Dockberry (2 R. 135).

Ortiz was accompanied to the new location by Agent Vasquez and Agent Rick Perez. Perhaps ten minutes after they arrived at the delivery site, Ortiz received a page (2 R. 36). It was Pena; he wanted to know where Ortiz was. Ortiz told him he was there in a van. Pena told him that he had just passed by and would be returning momentarily (2 R. 37, 58; 3 R. 409).

Pena arrived in Garcia-Castro's black Ford truck and pulled up beside the van. Ortiz got out of the van and walked toward the truck. At about the same time,

12

Pena had gotten out of the truck and started walking to the van with the contraband (2 R. 61, 113, 177; 3 R. 273, 275). Ortiz accepted the contraband tendered by Pena, walked back to the van, and handed the cocaine over to Rick Perez (2 R. 37, 164; 3 R. 275).

Perez accepted the drugs and the arrest signal was given. As the surveillance officers moved in, Pena fled in Garcia-Castro's truck. According to Agent Rolando Vasquez, Pena was heading straight toward Garcia-Castro's house (3 R. 275). Pena's flight path put him on a collision course with the incoming surveillance units. Agent Schexnayder swerved to avoid a collision and ended up in a ditch. Agent Marco Huerta did not swerve; he rushed forward straight for Pena. Pena did not yield and Huerta, like Schexnayder, soon found himself in the ditch (2 R. 137; 3 R. 410).

The agents got their vehicles back on the road and continued the pursuit. They followed the car off of the road, through some heavy brush to some hog pens (2 R. 138). Here Pena abandoned his truck. After Pena abandoned the truck, Agent Schexnayder called the Border Patrol for assistance. He determined that the area could be sealed off and Pena apprehended in the event he emerged from the brush (2 R. 139). A check on the truck's registration confirmed Ortiz's testimony: the

truck belonged to Horacio Garcia-Castro (2 R. 140).  The search for Pena in the brush proved fruitless (2 R. 140).

Meanwhile, Ortiz, Agent Perez, and Officer Vasquez proceeded to Garcia-Castro's house to see if Pena showed up there.  Perez and Ortiz waited in the van; Vasquez continued to search on foot.  While they were waiting, someone in a dark-colored Crown Victoria left the house.  Perez followed (2 R. 38; 3 R. 411-413).

Perez and Ortiz followed the Crown Victoria to Montoya's Grocery Store where a man got out.  Ortiz was not able to identify the suspect at that time.  The subject of their surveillance returned to his car and drove off.  Perez and Ortiz followed him to a Maverick Market store where he parked once more.  This time when the driver emerged from the Crown Victoria, Ortiz recognized him: it was Horacio Garcia-Castro (2 R. 39; 3 R. 413-416).

Garcia-Castro was arrested and taken to the Brownsville Police Department (2 R. 207).  The agents told Garcia-Castro they were looking for Arturo Pena.  Garcia-Castro gave the officers written consent to search his house and expressed his willingness to take the investigators to the house of Arturo Pena's parents (2 R. 144, 208, 210; 3 R. 217).  He told the investigators that he had loaned his truck to Pena earlier that day (2 R. 209; 3 R. 218).  This declaration struck Brownsville Police Department Officer Esteban Mendoza as odd: they had been watching Pena

14

drive about in another vehicle (2 R. 194, 209; 3 R. 218). Several agents went to Garcia-Castro's residence which was located behind his fence company while Agent Schexnayder and several others returned to the apartment complex where they had lost sight of Arturo Pena earlier. The vehicle they had been following was back in the spot designated for apartment 156, however, Pena was not at home (2 R. 145-46).

The search of the apartment leased to Arturo Pena and Javier Munoz proved fruitful. After Javier Munoz consented to a search of the apartment (2 R. 211), the agents found an assortment of drug paraphernalia including ziploc baggies, a scale, and 300 grams of cocaine in the bedroom and various smaller amounts of cocaine all around the kitchen (2 R. 146, 166, 181-184, 186, 211-12; 3 R. 220).

Agent John Schexnayder arrested Horacio Garcia-Castro under the authority of a federal arrest warrant on January 6, 1998 (2 R. 147; 3 R. 225). When he arrested Garcia-Castro, Agent Schexnayder saw Garcia-Castro take a small clear plastic baggy containing cocaine from his pocket (2 R. 149; 3 R. 225-226). Inside Garcia-Castro's vehicle, the agents found two dead horned lizards - a species the agents believed to be on the endangered species list (2 R. 154-55; 3 R. 228). Ironically, Garcia-Castro told the agents he kept the dead toads for good luck (3 R. 229).

Although no cocaine was found during the search of Garcia-Castro's residence, the officers did find and seized three firearms: a Smith & Wesson nine millimeter hand gun, a Smith & Wesson Model 1500 rifle with scope, and a Mossberg Model 590 12 gauge shotgun (3 R. 285). Possession of these firearms presented a bit of a problem for Garcia-Castro: he had been convicted in the Texas state courts for violations of the state's controlled substances laws (3 R. 266, 361, 364).

Before his house was searched on October 1, 1997, Garcia-Castro told Brownsville Police Officer Henry Etheridge, Jr. they would not find any drugs or guns in his house (3 R. 374). Garcia-Castro exuded confidence as he led Officer Etheridge through his house to the master bedroom. In this bedroom, Garcia-Castro reached out and grabbed a brown paper bag. Officer Etheridge promptly relieved Garcia-Castro of the sack thus seized and examined its contents: it held a Smith & Wesson pistol and two magazines (3 R. 375). Officer Etheridge told Garcia-Castro that he was pained that he would deceive him so; Garcia-Castro told the officer he had forgotten about that gun (3 R. 375). Behind a television stand in an enclosed case, the officers found a rifle; Garcia-Castro averred it was for deer hunting and he had not gone hunting for some time (3 R. 375). Finally, the officers found a Mossberg shotgun in Garcia-Castro's son's bedroom (3 R. 376).

16

Raymond Waller, Jr., a forensic chemist with the Texas Department of Public Safety (DPS) related that the substance seized by the agents from Ortiz-Aurelio and Arturo Pena on October 1, 1997, was cocaine (3 R. 316, 322). One of the samples examined by Waller weighed 503.48 grams; the other weighed 499.3 grams (3 R. 322, 323). A third sample weighed 323.89 grams (3 R. 324).

Arturo Pena Lozano (Pena) testified in Garcia-Castro's behalf (3 R. 435). Pena testified that all of the cocaine and the paraphernalia found in his and Javier Munoz's apartment belonged to him (3 R. 436). Pena declared that Guadalupe Ortiz called him on October 1, 1997, concerning the purchase of one-half a kilogram of cocaine (3 R. 436). He explained that Ortiz called Garcia-Castro because he did not have a telephone and Ortiz did not know his telephone number. Pena worked for Garcia-Castro, however. Ortiz knew this and knew that Garcia-Castro could locate him. Pena testified that no one mentioned cocaine to him until he talked to Ortiz personally (3 R. 437-438).

Pena averred that he took care of Garcia-Castro's livestock - he fed them and gave them their vaccinations. This is why he went to Garcia-Castro's house after leaving the hospital (3 R. 438). He used Garcia-Castro's pickup truck to haul the bales and food to the livestock (3 R. 439). After he had fed the animals, Pena said he went home to his apartment. He took Ortiz's call, picked up the drugs, and

17

headed to the designated delivery site. He was going to drop off Garcia-Castro's truck after delivering the cocaine to Ortiz (3 R. 440).

When asked if he had delivered cocaine to Ortiz earlier in the day, Pena denied it (3 R. 440). Pena claimed that he got the cocaine from someone from Matamoros named Hector Sanchez Aguilar (3 R. 441). Pena explained that he got into narcotics trafficking to secure sufficient funds for heart surgery for his little boy (3 R. 442).

Pena turned himself in a week and a half after the delivery because he knew he had been doing something bad. He declared that Garcia-Castro did not have anything to do with the offense (3 R. 443). He offered that the incident of October 1, 1997, was his first involvement in this type of thing and he was so frightened when the police moved in, he panicked and fled. He explained he was not heading to Garcia-Castro's house - he was just running (3 R. 445).

Curiously, when he pled guilty, Pena did not correct the government when it declared that Pena received his cocaine from Garcia-Castro (3 R. 460). Pena told the court he was confused during the rearraignment and did not hear the part about Garcia-Castro (3 R. 462).

Although Pena testified that Garcia-Castro told him Ortiz was looking for him, his name was not mentioned by either Garcia-Castro nor Ortiz during their first

18.

telephone conversation (4 R. 469).  When pressed on that part of the conversation referring to an earlier delivery, Pena averred he had dropped a roll of fencing off at the ranch purportedly owned by Garcia-Castro and Ortiz jointly (4 R. 471-472). He conceded that he did not take any fencing to the hospital that evening.  He also observed that he did not return to the ranch to around 9:00 p.m. to feed the livestock (4 R. 473).

When Pena insinuated that he was using Garcia-Castro's truck between seven and nine p.m., he was surprised to learn that he had been observed from the time he left the hospital until he returned to his apartment.  When he was told the agents followed him and Javier Munoz from their apartment at 8:30 p.m., he denied leaving with Munoz and declared that he had no way of knowing what time it was (4 R. 475).  Unfortunately, during his recorded telephone conversation with Ortiz, Pena manifested an obvious awareness of what time it was vis a vis the time they were going to meet at the hospital (4 R. 478-479).  At this point Pena confessed he did not have a telephone; the district court noted that he certainly did have a telephone because he had just identified his voice on the tape (4 R. 480).

Marco Antonio Villanueva managed Garcia Fence, Incorporated (4 R. 504). Villanueva explained that customers typically ordered "rolls" or "half rolls" of fencing (4 R. 505).  Indeed, Garcia Fence was apparently selling a lot of rolls and

half-rolls - Villanueva testified it was averaging roughly $30,000 a month and, when completing large contracts, say for a municipality or other government entity, it could gross $60,000 a month (4 R. 506).

## Amount of Drugs

The district court's findings concerning the amounts of drugs attributable to Garcia are supported by the record. *United States v. Dean*, 59 F.3d 1479. 1495 (5th Cir. 1995); *see also United States v. Duncan*, 191 F.3d 569, 575-76 & n.25 (5th Cir. 1999), *cert. denied*, 120 S.Ct. 1991 (2000); *United States v. Posada-Rios*, 158 F.3d 832, 881 (5th Cir. 1998), *cert. denied*, 526 U.S. 1031, 119 S.Ct. 1280 (1999). No error or prejudice has been shown by the absence of an objection at sentencing challenging the amount of drugs attributable to Garcia.

### 11.

In ground of error four, Garcia complains of counsel's "failure of misapplication in relation to this conviction rised [sic] to Ineffective Assistance of Counsel. This ground of error is incomprehensible. Garcia's ground of error substantively does not raise a federal constitutional claim that is cognizable under § 2255. *See United States v. Vaughn*, 955 F.2d 367, 368 (5th Cir. 1992); *see also United States v. Shaid*, 937 F.2d 228, 231-32 & n.7 (5th Cir. 1991) (en banc) (constitutional or jurisdictional issue reviewable for first time on collateral attack

20

only if the movant demonstrates cause for his procedural default and actual resulting prejudice or that the uncorrected error would result in a complete miscarriage of justice). An allegation of "miscarriage of justice" warrants collateral review where a constitutional violation has alleged to have caused the conviction of one innocent of the crime. *McCleskey v. Zant*, 499 U.S. 467, 495, 111 S.Ct. 1454, 1470 (1991); *Murray v. Carrier*, 477 U.S. 478, 485, 106 S.Ct. 2639, 2643 (1986). Garcia's argument is inadequate under that analysis.

### 12.

In ground five, he faults the district court's computation of his offense score under the guidelines. This is not a cognizable claim. *Vaughn*, 955 F.2d at 968. The complaint in ground of error six, that the court erroneously relied upon the PSR, likewise is not cognizable. The issue was not preserved on direct appeal, and Garcia does not fault appellate counsel for not raising the claim. Nevertheless, even now he does not demonstrate that the information developed during the trial and relied upon in the PSR was materially untrue or factually incorrect. *See United States v. Brown*, 97-20219, 2000 WL 821397 at *10 (5th Cir. June 26, 2000) (direct appeal). No attorney deficiency or prejudice has been shown.

13.

In ground of error seven, Garcia argues that he spoke with counsel only three times and, based on those visits, counsel failed to perform an investigation. Counsel filed numerous pretrial motions, including discovery (Doc. 10) and a motion to force the government to disclose any testimonial agreements with witnesses (Doc. 54). Garcia concedes in his pleadings that counsel discussed two plea offers on separate occasions. Garcia acknowledged at sentencing that he discussed the PSR with counsel, and the docket sheet reflects that Garcia and counsel were present together in court on January 11, 1998 (Doc. 26), March 5, 1998 (Doc. 56), and on March 6, 1998 (Doc. 67). The record refutes the number of times that counsel spoke with Garcia. In any event, Garcia does not show that counsel did not prepare for trial in accordance with Garcia's wishes.

Garcia insisted even after trial that he was not involved in the offenses. Counsel succeeded in calling Pena as a defense witness to accept responsibility for the drugs seized. Here, Garcia does not identify what evidence was not investigated, aside from the tactical decision that resulted in the decision to stipulate to the admissibility of the tape recording. Such stipulation does not reflect a failure to investigate. Garcia's failure to identify what evidence was not investigated and

22

demonstrate what the investigation would have revealed obviates further review. *See United States v. Green* 882 F.2d 999, 1003 (5th Cir. 1989).

The parties' reliance upon transcripts to assist the jury likewise presents no cognizable claim. The procedure employed by the court and the government during the trial was correct. Garcia does not argue that the tapes were unintelligible or that the predicate for admission of the tapes was not demonstrated. *See United States v. Stone*, 960 F.2d 426 (5th Cir. 1992). This issue is barred by his failure to preserve the issue and present it on direct appeal. His conclusory claim does not support the granting of § 2255 relief.

14.

In ground of error 9, Garcia faults the advice he was given by trial counsel concerning a plea offer. Garcia was told the government made an offer of 47 months conditioned upon his entry of a guilty plea.

Garcia understood the offer. Garcia chose not to accept that offer, and he now faults the advice given in rejecting the offer.

Garcia does not identify when the offer was made or the status of the case when the offer was discussed with his trial attorney. The timing may be important inasmuch as the rejection of the offer was made in the context that Garcia supplied his attorney with information, attested to by Pena, that he (Garcia) was in fact

23

innocent of the crimes alleged. This of course is consistent with Garcia's view of the absence of any proof of his complicity in the offenses.

Garcia does not reveal any information concerning those facts or address his defensive posture. While it is evident that there is no constitutional right to plea bargain with the government. *Weatherford v. Bursey*, 429 U.S. 545, 560, 97 S.Ct. 837, 846 (1977), it is unclear what advice was given, when it was given and in what context it was given to Garcia except insofar as Garcia claimed innocence. Garcia pled not guilty *ab initio* and persisted in that plea. He has never accepted responsibility for his conduct or complicity in the offense, and even now, fails to demonstrate that he would have entered a guilty plea to the drug charges filed in connection with the indictment.

Garcia' complaint is vague and conclusory. Initially, Garcia identifies the issue as one resolving whether counsel gave "no advice about desirability of a plea offer"(§2255 motion, p. 3). Yet, in his factual summary, he argues that counsel recommended against accepting a 47-month possible plea offer, and that Garcia agreed. Garcia does not state whether the offer occurred prior to discovery or after Garcia had insisted upon proceeding to trial. He also does not explain the timing of the offer in the context of Pena's testimony or Garcia's proffer of Pena's offer to establish his (Garcia's) innocence.

24

Garcia argues in conclusory fashion that counsel "erroneously advise" [sic] him not to accept the offer, but does not discuss how the offer was erroneous--aside from claiming that counsel said "the government had nothing on evidence against [Garcia]" and to claim that trial counsel's financial interest of proceeding to trial outweighed any duty to the client.   He offers no evidence to substantiate those speculative and conclusory assertions.   Furthermore, Garcia's claim, that he wanted to plead guilty, is inconsistent with the posture he has taken on appeal, in this action as well as in the proceedings prior to trial.   Even in the PSR, Garcia denied complicity in the offense. The record refutes Garcia's claim that he wanted to plead guilty; to the contrary, the record reflects that Garcia intended to aggressively defend himself through trial and beyond.   No relief is warranted under this theory.

15.

Garcia's factual premises are either insupportable by the record or not supported by any identifiable evidence. The allegations for the most part are speculative, vague and conclusory. Thus no evidentiary hearing is necessary to resolve his claims. *See United States v. Samuels*, 59 F.3d 526, 530 & ns.16-17 (5th Cir. 1995)(citations omitted); *United States v. Bartholomew*, 974 F.2d 39,41-42 (5th Cir. 1992). He alleges no facts which would be the proper subject of a motion to correct sentence, vacate the judgment, or which would warrant an evidentiary

25

hearing under either 28 U.S.C. § 2255. Therefore, the government moves for dismissal, or in the alternative, summary judgment.

CONCLUSION

WHEREFORE, PREMISES CONSIDERED, the government respectfully prays that Garcia's §2255 petition be dismissed, or in the alternative, denied by summary judgment.

Respectfully submitted,
MERVYN M. MOSBACKER
United States Attorney

JAMES L. TURNER
Chief, Appellate Division
Assistant United States Attorney

JEFFERY A. BABCOCK
Assistant U.S. Attorney
P.O. Box 61129
Houston, Texas 77208-1129
Texas Bar No. 01481400
(713) 567-9201

## CERTIFICATE OF SERVICE

I, Jeffery A. Babcock, Assistant United States Attorney, certify that a true

and correct copy of the above document has been served by placing same in United

States mail, postage prepaid, today, August 2, 2000, addressed to:

Horacio Garcia-Castro
No. 77632-079
FCI Bastrop
PO Box 1010
Bastrop, TX 78602

Jeffery A. Babcock
Assistant U.S. Attorney

27

IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE SOUTHERN DISTRICT OF TEXAS

BROWNSVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § § | Criminal No. B-97-490-S1-1 |
| vs | § § | Civil No. B-00-097 |
| Horacio Garcia-Castro | § | |

## U.S. ATTORNEY'S NOTICE OF RECEIPT OF MOTION

Petitioner's motion under 28 U.S.C. 2255 has been filed by the Clerk and entered in the above numbered criminal action in which judgement has been rendered.

By signing below, the United States Attorney acknowledged receipt of said motion. The United States Attorney is not required, however, to answer or otherwise move with respect to the motion unless so ordered by the Court.

MAILED BY:

_Maxine Garza_

Maxine Garza, Deputy Clerk

_6-28-00_
Date

RECEIVED BY:

_B_

U.S. Attorney's Office

_7-5-00_
Date